**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

LORENA E. BOSTIC,                       )
　　　　　　Plaintiff,                    )
                                        )
　　v.                                   )      CAUSE NO.: 2:15-CV-429-JPK
                                        )
SALVADORE VASQUEZ; CLARENCE D.          )
MURRAY; DIANE ROSS BOSWELL;             )
THOMAS P. STEFANIAK, JR.; JAN           )
PARSONS; and MIROSLAV RADICESKI,        )
　　　　　　Defendants.                   )

**OPINION AND ORDER**

This matter is before the Court on the motion for summary judgment filed by Defendants

Salvadore Vasquez, Clarence D. Murray, Diane Ross Boswell, Thomas P. Stefaniak, Jr., and Jan

Parsons (collectively "the Moving Defendants"[1]). [DE 220]. The Moving Defendants argue they

are entitled to judgment as a matter of law on Plaintiff Lorena E. Bostic's claims that they violated

her constitutional rights by failing to protect her from a sexual assault perpetrated by her probation

officer, Defendant Miroslav Radiceski.[2] In response to the Moving Defendants' motion, Bostic

concedes that Defendants Vasquez, Boswell, and Stefaniak are not liable. [DE 232 at 10].

Accordingly, summary judgment will be entered in favor of those defendants.

Before turning to the summary judgment arguments of the two remaining Moving

Defendants, Jan Parsons and Judge Clarence D. Murray, the Court wishes to acknowledge that

---

[1] Defendants Vasquez, Murray, Boswell and Stefaniak are or were at relevant times Judges of the Superior Court of Lake County, Indiana (Criminal Division), while Defendant Parsons was the Chief Probation Officer of Lake County. Judge Boswell passed away on October 19, 2021. [DE 204].

[2] Defendant Radiceski has not moved for summary judgment, and trial on Bostic's claims against him will proceed regardless of the outcome of the Moving Defendants' motion for summary judgment.

certain facts do not appear to be in dispute, at least for purposes of this motion. The Moving Defendants do not contest that Bostic was the victim of a probation officer who used his governmental power to sexually assault her. The Moving Defendants, represented in this matter by the State of Indiana, ask the Court to enter summary judgment in their favor notwithstanding that a probation officer wielded governmental power to engage in atrocious and illegal actions. While legal arguments may require the granting of the motion for summary judgment, that does not negate the fact that Bostic's allegations, if true, represent a terrible harm perpetrated by a public official who abused his position of public trust.[3]

---

[3] The Seventh Circuit has recognized that "[t]he confinement setting is a tinderbox for sexual abuse." *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 381 (7th Cir. 2020), *cited in Slabey v. Dunn Cnty., Wis.*, No. 2020AP877, 2023 WL 219167, at *12 (Wis. Jan. 18, 2023) (Karofsky, J., dissenting) ("While women are vulnerable almost everywhere in our society, they are especially at risk in correctional settings where an estimated 25 to 41 percent of incarcerated women are sexually abused." (citations omitted)). (Of course, it is not only women who face such risks. This quote merely illustrates that courts have recognized such risks when facts have mirrored those presented in this case.) Although parolees may not be as vulnerable to sexual abuse and sexual assault as incarcerated individuals, it remains true that, as parolees, they are "in the legal custody of a parole officer who monitors [their] adherence to the conditions of [their] parole." *Ficklin v. Rusinko*, 351 F. Supp. 3d 436, 444 (W.D.N.Y. 2019) (citing *United States v. Thomas*, 729 F.2d 120, 123 (2d Cir. 1984))). Furthermore, "the Supreme Court [has] found [that] those on parole and pre-parole, respectively, ha[ve] a liberty interest in remaining out of prison." *Tompkins v. Pullen*, No. 3:22-CV-00339 (OAW), 2022 WL 3212368, at *9 (D. Conn. Aug. 9, 2022) (citing *Morrissey v. Brewer*, 408 U.S. 471 (1972), and *Young v. Harper*, 520 U.S. 143 (1997)). That liberty interest is easily threatened by "the imbalances of power" between the parole officer and the parolee, thereby making the parole setting, much like "the correctional context" more generally, "ripe for abuse." *Slabey*, 2023 WL 219167, at *12 (Karofsky, J., dissenting) (citations omitted). The potential for abuse became a reality here, per the Stipulated Facts in the criminal case brought by the State of Indiana against Radiceski, wherein it is stated that Bostic "felt compelled to submit to the sexual desires of [Radiceski], because [Radiceski] had direct control over her freedom, and could cause her probation to be revoked at any time, which would result in her going to prison." [DE 232-8 ¶¶8, 10 (*State v. Radiceski*, Cause No. 45G03-0911-FC-00148)]. "Victims of sexual abuse often confront profound physical, social, and psychological effects. These effects can be debilitating and overwhelming, and they are magnified in confinement [or threat of confinement] settings." *Slabey*, 2023 WL 219167, at *13 (Karofsky, J., dissenting) (citations omitted).

## A.    STANDARD OF REVIEW

The Federal Rules of Civil Procedure require the entry of summary judgment against a party "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) (quoting *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). A party opposing summary judgment must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Doxtator v. O'Brien*, 39 F.4th 852, 860 (7th Cir. 2022) (quoting *Liberty Lobby, Inc.*, 477 U.S. at 249). In other words, the record must reveal that no reasonable jury could find for the non-movant. *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations omitted). Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). A court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party, *Liberty Lobby,* 477 U.S. at 25, but the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). 'If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Doxtator*, 39 F.4th at 860 (quoting *Liberty Lobby*, 477 U.S. at 249–50).

## B.      FACTUAL BACKGROUND

The Court describes the material facts in the light most favorable to Bostic, the non-movant. These facts have not been tested through a trial, and the Court is not finding that any particular action actually occurred, or that Parsons or Judge Murray failed to take any action. The case remains set for trial against Defendant Radiceski. These facts are merely recounted as they stand for purposes of summary judgment.

### 1.      Prior Alleged Assault of Another Female Probationer in 2011

In the relevant time period, Defendant Parsons was the Director of Probation for Lake County. As the chief probation officer, Parsons was tasked with directing and supervising the probation department, and taking appropriate corrective actions when the probation officers failed to meet expectations. [Pl. Ex. F, Deposition of Jan Parsons, 11:17-12:7, 33:5-35:20]. The probation department had no formal rules or procedures to address complaints against probation officers. This is true even though, prior to 2011, a former chief probation officer was demoted without termination after criminal charges were filed against him for trying to kiss a female probationer in her home. [*Id.*, 71:2-72:16; Pl. Ex. B, Deposition of Gisela Thielbar, 35:10-21].

On June 5, 2011, a probationer ("A.R.") reported to Parsons that her probation officer, Defendant Radiceski, had behaved inappropriately. A.R. wrote in a typed written statement [Def. Ex. A] that she was "quite disturbed with what took place" at the end of a routine meeting on May 9, 2011. Radiceski noticed rings on her fingers and asked if she was married. A.R. replied that she was not married. Soon after, Radiceski noticed a tattoo on A.R.'s wrist and asked if she had any more. A.R. replied that she had four tattoos, including the one on her wrist. Radiceski then told A.R. to follow him to the main probation office. As they were walking to the probation office, Radiceski asked if he could see A.R.'s other tattoos. A.R. did not object, believing that "it was

4

mandatory" and that she "was being taken somewhere to take pictures of them to keep on file for identifying marks."

After visiting the probation office, Radiceski told A.R. to follow him to a hallway by the office. He then opened a door, which turned out to be a stairwell, and told A.R. to walk to the top. As they were walking up the stairs, he asked her "questions like why [she] was single and other things that were making [her] start to feel a little uneasy." At the top of the stairs, still under the impression that she was being taken to an office to view her tattoos, Radiceski told A.R. to stop and show him her tattoos in the stairwell. Once again, A.R. "did not want to say no because at the time [she] was a little scared to speak up and object because he [was her] probation officer. [She] ha[d] never been on probation before and [did] not know normal procedure, so [she] did not want to be insubordinate."[4] A.R. then showed Radiceski her tattoos, which were on her rib cage, lower back, hip and wrist. To show the tattoos on her lower back and hip, she had to lift her shirt in the back and move her pants a little; to reveal the tattoo on her rib cage she had to lift her shirt in the front "quite a bit."

After showing Radiceski her tattoos, A.R. "was feeling very uneasy about the situation and asked if [she] could have a seat on the stairs so [she] was able to process what was going on. He then sat next to [her] and lifted [her] shirt himself to view the tattoo on [her] back again, and then moved away [her] pants quite some ways to view the tattoo on [her] hip again." A.R. did not say anything, but reported that "it definitely made [her] feel a whole lot more uncomfortable." She "sat there in awkward silence, and he then said, since you are not married and you don't have a boyfriend, … when [was] the last time [you] had sex[?]." A.R. replied "I don't know," and then

---

[4] In fact, probation officers do not inspect a probationer's body for tattoos at any location, much less in a stairwell, but there is no written policy about it. [Pl. Ex. C, Deposition of Angela McFerrin, 17:7-18:1].

asked if she could go. Radiceski said yes and then walked A.R. down the stairs and to the front door.

A.R. reported to Parsons that after she got in her car, she was in shock about what happened. She called a friend, who was an officer for Lake County, to tell him about the incident, and he advised that she report it to her attorney, which she did. A.R. reported to Parsons: "I am very disturbed by this to the point that I do not want to be left alone with my probation officer. I am trying to abide by all probation regulations and do what I need to do that is required of me, but I don't [] want this probation officer to be assigned to me anymore, nor do I want him to contact me in person or over the phone, and that is all I ask from this incident." [Def. Ex. A].

Parsons investigated A.R.'s complaint by meeting with A.R. and Radiceski, and seeking any available surveillance footage from building security. When asked, Radicescki denied any inappropriate behavior. [Parsons Dep. 76:21-79:23]. Parsons acknowledged that if A.R.'s allegations were true, Radiceski's actions would not only have been a battery, but also a violation of the probation officer code of conduct that could have led to Radiceski's termination. [*Id.* 17:11-18:14, 91:6-24, 102:9-20]. Under the standards for probation officers adopted by the Indiana Judicial Conference Board of Directors, Parsons was required to draft a written report about the results of her investigation of A.R.'s complaint to be given to Judge Murray and Radiceski. [*See* Pl. Ex. A at 16-17]. However, Parsons never obtained a detailed response from Radiceski outlining all of his interactions with A.R. on the date in question, which would have required him to admit or deny that he had taken A.R. out of the probation office and into a secluded location in the stairwell. [Parsons Dep. 77:13-80:12, 84:2-85:21].

Parsons met with Judge Murray and at least one other probation officer, Tammy Stone, at which time it was decided that A.R. would be assigned a different probation officer. Parsons gave

a copy of A.R.'s complaint to Judge Murray,[5] and testified that she drafted a written report, but that it did not include the results of the investigation, only the facts of the incident. [*Id*. 64:15-65:18]. There is no evidence that a finding was ever made by any court employee as to whether A.R.'s allegations were true.

In addition to not reaching any conclusions about the incident, Parsons' report did not include any proposed discipline. She had the authority to recommend termination of an officer, although Judge Murray had the final say. [*Id*. 33:3-23]. Parsons testified that she did not take any disciplinary action against Radiceski for the A.R. incident because, while she had the power to institute disciplinary proceedings, she was relatively new in her job and had not dealt with this kind of issue before. She therefore wanted Judge Murray's expertise and advice before drawing any conclusions. [*Id*. 64:6-66:21]. Again, taking the facts as they stand on summary judgment, Judge Murray himself never instructed her to discipline Radiceski. [*Id*. 103:5-105:1]. Judge Murray also testified that he did not institute any new or different policies or monitor Radiceski's activities, because he believed those actions were within Parsons's purview. [Pl. Ex. E, Deposition of Clarence Murray, 48:17-24].

Judge Murray testified that if a probation officer's conduct was sufficiently egregious, he would be terminated, and the Indiana State Police would be alerted. He also testified that he directed Parsons to contact the Indiana State Police to investigate A.R.'s complaint, and that, although he never saw a written report, to his memory the results of the police investigation were

---

[5] This fact is presented by the parties as undisputed. *See* [DE 221 ¶ 4; DE 233 ¶¶ 4, 38; DE 238 ¶ 38]. Judge Murray testified, however, that he never saw A.R.'s complaint. He did state that he was told about the incident, and specifically, that Radiceski had allegedly taken A.R. out of the probation department and into a stairwell so he could see her tattoos, making her uncomfortable, and that she wanted a new probation officer. [Murray Dep., 43:18-46:5]. Thus, regardless of whether Judge Murray received an actual copy of A.R.'s complaint, he acknowledged that he was aware of its essential details.

inconclusive. [Murray Dep. 47:24-48:14, 52:11-23]. According to Stone and Parsons, however, Judge Murray told them that because A.R. had not directly alleged sexual assault and had not requested anything other than a new probation officer, it was not necessary to involve the police. [Pl. Ex. D, Deposition of Tammy Stone, 13:19-14:11; Parsons Dep. 40:4-23]. Again, in the summary judgment context the facts are viewed in the light most favorable to Bostic. There very well may be reasons for any apparent differing memories, but that is an issue for trial. Although Parsons did not contact the Indiana State Police, it was agreed that Radiceski would not be assigned any more female probationers. It is undisputed that the reason for the decision to remove female probationers from Radiceski's supervision was out of caution and concern for their safety as well as to lower the risk of harm to female probationers. [DE 238, ¶ 38].

### 2.    Sexual Assault of Lorena Bostic in 2013

In 2013, Radiceski began supervising female probationers again, due to a shortage of available officers. Radiceski had been performing "intake" duty, escorting new probationers (including women) to the probation office, and there had been "no incidences" with any of those probationers. [Parsons Dep. 110:5-111:18]. However, only a few days before the incident at issue in this case, Radiceski specifically asked to supervise a female probationer who had mental health issues. Radiceski "kept asking," and was "persistent" in his requests, but Stone and Parsons were concerned by Radiceski's desire to supervise this particular probationer, and therefore assigned her to another officer. [Stone Dep. 80:7-80:19; Parsons Dep. 112:13-115:3]. Parsons testified that, when she learned about the assault on Bostic a few days later, her thoughts turned to the probationer with the mental health issues:

> … I remember when [Radiceski] came into the office telling us that he got the phone call from [Bostic] about the rape allegation—or the rape charge. Tammy [Stone] and I both said, Aha. Well, not aha, but

that we're glad that we didn't assign that [other probationer's] case
to him.

[Parsons Dep. 115:8-21].

Radiceski sexually assaulted Bostic on November 26, 2013. Bostic was, according to Parsons, "one of the unlucky ones that [sic] got assigned to Radiceski." [*See* DE 238 at 13-14]. During their second probation meeting, Radiceski was alone with Bostic in his office, and he put his hand on her leg and began rubbing her leg. Bostic told him not to do that, and removed his hand from her leg. Within only a few days of this rebuff of his sexual advance, Bostic received a petition to revoke her probation, which meant she could face up to 3 years in jail. When Bostic questioned Radiceski as to why he had set the revocation hearing, Radiceski basically shushed her and then told her not to worry about it, that she needed him to help her, that he was the only one that could help her, and that he was going to take care of it. Thereafter, Radiceski would get Bostic alone in his office for appointments and would proceed to grope and fondle her body. When asked why she did not tell others in the office, Bostic stated that, while she did not know the other officers, she did know they worked with Radiceski, and she was afraid that she would be sent to jail. [Pl. Ex. G, Deposition of Lorena Bostic, 39:12-40:25, 52:19-56:17, 63:18-64:18, 71:11-24].

On the day of the rape,[6] Bostic appeared for the petition to revoke her probation, and, after the hearing, Radiceski told her to follow him. Bostic thought they were going to his office for an

---

[6] The Court notes that the state defendants object to the use of the word "rape" on the ground that Radiceski pleaded guilty to "sexual battery" under Indiana Code § 35-42-4-8, rather than "rape" under Indiana Code § 35-42-4-1. [DE 238 ¶ 46]. As discussed *infra*, Radiceski stipulated in the criminal proceedings against him to facts that could establish the crime of rape, i.e., fellatio and sexual intercourse, *see* Ind. Code § 35-42-1, § 35-31.5-2-221.5, if Bostic was "compelled by force or imminent threat of force" to submit to those acts, Ind. Code § 35-42-1. The same force/imminent threat of force requirement applies to the crime of sexual battery, which is defined as "touching with the intent to arouse or satisfy the person's own sexual desires." Ind. Code § 35-42-4-8. Radiceski stipulated that Bostic "*was* compelled to submit" to his touching that constituted sexual battery, but he only stipulated that Bostic "*felt* compelled to submit" to the acts that would constitute rape if done under the threat of force. The issue here, however, is not what facts

appointment, but he took her in the stairwell and started going up the stairs instead of going down the stairs where the probation department was located. When Bostic questioned him about where they were going, Radiceski shushed her several times and told her not to worry about it. When they got to the top of the stairwell, where there were no cameras and she was secluded with him, Radiceski proceeded to sexually assault and rape her. [*Id*. 85:25-86:24].

In the criminal case against him, Radiceski signed a stipulation of facts admitting that the following occurred:

> 6.   …. [A]fter said probation revocation hearing, Miroslav Radiceski directed Lorena Bostic to go to his office by way of the east stairwell of the second floor in Building B, and instead led her up to the third-floor landing.

> 7.   …. [O]nce at said landing within the stairwell, Miroslav Radiceski and Lorena Bostic engaged in fellatio, and then Miroslav Radiceski had sexual intercourse with Lorena Bostic from behind.

> 8.   …. Lorena Bostic felt compelled to submit to the sexual desires of Miroslav Radiceski, because Miroslav Radiceski had direct control over her freedom, and could cause her probation to be revoked at any time, which would result in her going to prison.

> 9.   …. Miroslav Radiceski did knowingly and intentionally touch Lorena Bostic with the intent to arouse his own sexual desires.

> 10.   …. Lorena Bostic was compelled to submit to said touching by the threat of force, to wit: unlawful arrest and detention within[] the Indiana Department of Correction.

[Def Ex. H (*State v. Radiceski*, Cause No. 45G03-0911-FC-00148)].

---

Radiceski admits or what crime Radiceski pleaded guilty to, but what a jury could infer on the evidence. And at summary judgment, the Court makes all inferences in Bostic's favor, which includes on the present record the inference that if (as Radiceski admitted) Bostic "was compelled" to submit to his touching with intent to arouse or satisfy his sexual desires, she very likely also not only "felt compelled" but "*was* compelled" to submit to the other sexual acts that Radiceski admitted occurred, which would mean those acts constituted the crime of rape.

## C.   ANALYSIS

The issue before the Court is whether Parsons and/or Judge Murray are entitled to judgment as a matter of law on Bostic's claim under 42 U.S.C. § 1983[7] for failing to protect her from sexual assault by Radiceski. To state a § 1983 claim, Bostic must allege that she was deprived of a right secured by the Constitution or laws of the United States by a person or persons acting under color of state law. *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021). Bostic alleges, and the Moving Defendants do not contest, that the Due Process Clause of the Fourteenth Amendment gives Bostic the right to be free from sexual assault. Furthermore, it is undisputed that the perpetrator of the sexual assault, Radiceski, was acting under color of state law as a probation officer at the time of the assault. But Bostic does not assert that either Parsons or Judge Murray sexually assaulted her. Instead, she asserts that those Defendants are liable under § 1983 for Radiceski's sexual assault. Parsons and Judge Murray argue in response that they cannot be held constitutionally liable for Radiceski's rape, and that, even if a jury could find that they personally violated Bostic's constitutional rights, they are entitled to qualified immunity as a matter of law. Because the qualified immunity inquiry overlaps with the merits issue of whether Parsons and/or Judge Murray violated Bostic's constitutional rights, the Court will structure its discussion around that issue.

### 1.   The Qualified Immunity Inquiry

"[T]o ensure that fear of liability will not 'unduly inhibit officials in the discharge of their duties,'" officials who are charged with having violated a plaintiff's constitutional rights "may

---

[7] Bostic initially pleaded a state law claim for willful and wanton misconduct, which was dismissed in 2018. [*See* DE 113]. The only remaining count in the complaint is Count 1, titled "[1]8 U.S.C. § 1983 Violations," which alleges six different ways in which the Moving Defendants' actions (or inactions) violated Bostic's constitutional rights. [DE 81 at 6-12]. In the interest of clarity, the Court refers to these allegations as a single claim under § 1983.

claim qualified immunity; so long as they have not violated a 'clearly established' right, they are shielded from personal liability." *Camreta v. Greene*, 563 U.S. 692, 705 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987), and *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To determine whether a public official is entitled qualified immunity, the Court "undertake[s] a two-part analysis asking: (1) whether the facts alleged, '[t]aken in the light most favorable to the party asserting the injury, … show the officer's conduct violated a constitutional right'; and (2) whether the right was clearly established at the time of the alleged violation." *Nanda v. Moss*, 412 F.3d 836, 841 (7th Cir. 2005) (quoting *Saucier v. Katz*, 533 U.S. 194 (2001)); *see also Pearson v. Callahan*, 555 U.S. 223 (2009); *Brooks v. City of Aurora, Ill.*, 653 F.3d 478, 483 (7th Cir. 2011) (quoting *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010)). The burden of proof is on the plaintiff to show that qualified immunity does not apply. *Holloway v. City of Milwaukee*, 43 F.4th, 760, 767 (7th Cir. 2022). The Court "may address the prongs in whichever order [it] believe[s] best suited to the circumstances of the particular case at hand." *Id*. (quoting *McAllister* (citing *Pearson*))); *see also Pearson*, 555 U.S. at 236 (holding that it "should not be regarded as mandatory in all cases" to address first whether a deprivation occurred but "recogniz[ing] that it is often beneficial" and leaving the sequencing choice to the discretion of the individual courts)).

When a defendant raises a qualified immunity defense, "[i]f prior case law has not clearly settled the right, and so given officials fair notice of it," courts have the option of reaching a ruling only on the second prong of the defense and thereby avoid deciding "whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit." *Camreta*, 563 U.S. at 705. Not only *may* the Court skip over the merits issue in the first prong of the qualified immunity test, the Supreme Court has instructed that "a court *should* forebear resolving [the merits] issue. After all, a 'longstanding principle of judicial restraint requires that courts avoid reaching constitutional

12

questions in advance of the necessity of deciding them.' In this category of qualified immunity cases, a court can enter judgment without ever ruling on the (perhaps difficult) constitutional claim the plaintiff has raised." *Id.* (citations omitted; emphasis in original). As the Seventh Circuit recently stressed, the Supreme Court has admonished lower courts to "think hard, and then think hard again, before addressing both qualified immunity and the merits of an underlying constitutional claim." *McGee v. Parsano*, 55 F.4th 563, 572 (7th Cir. 2022) (internal quotations and citations omitted; quoting *Dist. Of Columbia  v. Wesby*, 138 S. Ct. 577 n.7 (2018) (quoting *Camreta*, 563 U.S. at 707)).

Nevertheless, the Supreme Court also has instructed "that [the Court's] regular policy of avoidance sometimes does not fit the qualified immunity situation because it threatens to leave standards of official conduct permanently in limbo." *Camreta*, 563 U.S. at 706. If courts continually apply qualified immunity to a constitutional claim without ever deciding the merits of whether a constitutional violation occurred, "the moment of decision does not arrive. Courts fail to clarify uncertain questions, fail to address novel claims, fail to give guidance to officials about how to comply with legal requirements. Qualified immunity thus may frustrate 'the development of constitutional precedent' and the promotion of law-abiding behavior." *Id.* (footnote and citations omitted). "For this reason, [the Supreme Court has] permitted lower courts to *avoid avoidance*—that is, to determine whether a right exists before examining whether it was clearly established. Indeed, for some time [the Supreme Court] *required* courts considering qualified immunity claims to first address the constitutional question, so as to promote 'the law's elaboration from case to case.'" *Id.* (emphasis added; internal citations omitted). It is only "[m]ore recently" that the Supreme Court has "left this matter to the discretion of lower courts." *Id.* Thus, while "*[i]n general*, courts should think hard, and then think hard again, before turning small cases into large ones[,]"

… it remains true that following the two-step sequence—defining constitutional rights and only then conferring immunity—is sometimes beneficial to clarify the legal standards governing public officials." *Id.* at 706-07 (emphasis added; internal citations omitted).

Here, although the Court ultimately does not definitively decide whether Parsons and/or Judge Murray violated Bostic's constitutional rights, it does conclude that it would be beneficial to discuss that issue in some detail. That is, the Court ultimately resolves the summary judgment motion under the second prong of the qualified immunity test that asks whether clearly established law in 2013[8] would have put reasonable officials in Parsons' and Judge Murray's positions on notice that their conduct violated Bostic's constitutional rights. But for clarity purposes, and in an effort to facilitate rather than frustrate "the development of constitutional precedent and the promotion of law-abiding behavior," *Camreta*, 563 U.S. at 706, the Court will "begin by sketching the general contours of the constitutional inquiry to provide a framework for [its] subsequent discussion of the clearly-established analysis." *Perry v. Durborow*, 892 F.3d 1116, 1121 (10th Cir. 2018).

### 2.      Step One: Violation of a Constitutional Right

It is well established that the doctrine of *respondeat superior* does not apply to actions brought under § 1983. *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 614 (7th Cir. 2002). As a result, Parsons and Judge Murray can be held liable for Radiceski's sexual assault under § 1983 only if they had some "personal involvement in the constitutional deprivation." *Id.* at 614-15; *see also Hildebrandt v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003). Bostic argues that Parsons' and Judge Murray's personal involvement in Radiceski's constitutional violation can be

---

[8] Additionally, Judge Murray and Parsons "could still be entitled to qualified immunity if the undisputed facts show that [their] conduct violates no constitutional right under current law." *Locke v. Haessig*, 788 F.3d 662, 668 (7th Cir. 2015).

14

established under principles of supervisory liability. Bostic also argues that Parsons and Judge Murray committed a separate constitutional violation, pursuant to the Supreme Court's decision in *DeShaney v. Winnebago County Dept. of Social Services*, of failing to protect her from being raped by Radiceski. The Court first considers Bostic's *DeShaney* argument, and then addresses the issue of supervisory liability.[9]

### (a)     Constitutional Right To Protection

Bostic seeks to hold Parsons and Judge Murray liable under a failure to protect theory, citing *DeShaney*. In *DeShaney*, the Supreme Court held "that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." 489 U.S. 189, 197 (1989). But the Court suggested that a different result may have issued under either of two different circumstances: (1) instances where the state has a "special

---

[9] To be clear, Bostic's failure to protect argument under *DeShaney* and her supervisory argument "are not competing frameworks for liability," as they "concern fundamentally distinct subjects." *First Midwest Bank Guardian of Est. of LaPorta*, 988 F.3d at 990. Supervisory case law addresses the issue of "who can be sued under [§ 1983]"; it does not address "the substance of any right under the federal Constitution." *Id.* "*DeShaney*, on the other hand, addressed the substance of the constitutional right to due process. The Court interpreted the Due Process Clause and defined its scope, strictly limiting the circumstances under which" a failure to protect claim is cognizable as a due-process violation. *Id.* (citations omitted). To succeed on her supervisory claim, Bostic has to identify "a constitutional violation *in addition to* the requirements for [supervisory] liability." *Id.* (emphasis in original). She has done that here by asserting a violation by Radiceski acting under color of law of her right to bodily integrity, in this context meaning to be free from a sexual assault by her probation officer. There is some confusion in Bostic's arguments, however, in the suggestion that Parsons' and/or Judge Murray's failure to protect her from the sexual assault is evidence establishing supervisory liability, when the constitutional right of protection is (under certain specified circumstances) a cognizable constitutional right in itself, separate from the constitutional right to bodily integrity. *See, e.g.*, *Kemp v. Fulton Cnty.*, 27 F.4th 491, 494 (7th Cir. 2022) (incarcerated individuals have a right to protection pursuant to the Eighth Amendment); *id.* at 495 (pretrial detainees have a right to protection pursuant to the Due Process Clause); *DeShaney*, (discussed in next section) (persons who qualify under the "state-created danger" or "special relationship" principles *may* have a constitutional right to protection). The point is, it may be the case that a failure to protect from harm can also be a means of establishing liability for some other constitutional right violation such as the right to bodily integrity, but that principle is not necessarily shown by citation to cases finding a substantive constitutional right of protection.

relationship" with (i.e., involuntary custody of) the victim such that the victim is unable to protect herself, and (2) instances where the state takes affirmative steps that subject the victim to harm or make the victim more vulnerable to harm (the "state-created danger" exception). *Id*. at 199-201. According to the Seventh Circuit, "[l]ower courts have since transformed these into full-blown exceptions to *DeShaney's* holding that a state does not violate the Due Process Clause by failing to protect an individual against private violence, though [the Seventh Circuit] has described the exceptions as 'limited' and 'narrow.'" *Doxtator v. O'Brien*, 39 F.4th 852, 866 (7th Cir. 2022) (quoting *First Midwest Bank Guardian of Est. of LaPorta,* 988 F.3d at 988)).

Bostic appears to rely on both the state-created danger exception and the special relationship exception in arguing that a jury could find Parsons and Judge Murray liable for a constitutional violation. According to Bostic, the evidence is sufficient to withstand summary judgment on a state-created danger claim because it shows: "(1) by an affirmative act, Judge Murray and/or Parsons created a dangerous situation or increased the danger that she faced; (2) Judge Murray's and/or Parson's failure was the proximate cause of harm to Bostic; and (3) Judge Murray's and/or Parsons' failure to protect [ ] Bostic 'shocks the conscience.'" [DE 223 at 20 (quoting *King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 818 (7th Cir. 2007))]. But Bostic's development of this argument ends there, with no further discussion of the specific evidence in the record that would support each of the three findings that would be required to hold Parsons and Judge Murray liable under the cited test. At the very least, the evidence does not support a finding that Judge Murray took an "affirmative act" that placed Bostic in a position of danger that she was not already facing. *King ex rel. King,* 496 F.3d at 818-19. As previously discussed, after the decision to reallocate the female probationers following A.R.'s complaint about Radiceski, Judge Murray made no changes to policy and took no further decisions as to

Radiceski. On this evidence, no reasonable juror could find that he should be liable under § 1983 based on a state-created danger theory.

In any event, the Seventh Circuit in *Weiland v. Loomis*, 938 F.3d 917 (2019), suggested that the three-part test cited by Bostic might not be an accurate reflection of the state-created danger exception that *DeShaney* "hinted that the Constitution *might* support." *Id.* at 921 (emphasis in original); *see id.* at 920 ("None of these elements has its provenance in *DeShaney*."). Instead, the court said that a more proper focus of a state-created danger exception, which might allow a court to find a constitutional right to state protection, is whether "the state has disabled or undermined self-help or sources of private assistance." *Id.* The court ultimately did not decide the issue, however, leaving for another day the question of whether the three-part test is compatible with *DeShaney* and several other Seventh Circuit cases. *Id.* (citing cases). Without further development of the issue, the Court cannot say that Bostic's state-created danger argument could survive summary judgment. Given this ambiguity, the Court cannot conclude that any violation of Bostic's rights predicated on this theory was an infringement of clearly established law sufficient to overcome the defense of qualified immunity.

To support her argument that Parsons and/or Judge Murray can be held liable for failure to protect based on the special relationship exception, Bostic cites *Sexton v. Cernuto*, 18 F.4th 177 (6th Cir. 2021). In *Sexton*, the special relationship exception was applied to a work-release program. Bostic argues that she qualifies for the special relationship exception because, similar to the plaintiff in the work-release program, she was "restrained" by the threat of incarceration and Radicescki's ability to order her to appear at probation hearings and appointments. [DE 232 at 16]. Although the Court understands Bostic's argument, *Sexton* is distinguishable. The probationers in that program were made to ride a van with their supervisors to a worksite, work directly under

their supervision for hours at a time, and were not allowed access to their phones. *Id*. at 181. The *Sexton* court noted that this program placed "far more restrictions" on the probationer than programs of compulsory education or involuntary medical care that had not qualified for the special exception theory. The work-release program in *Sexton* also was distinguishable from another program examined by the court, in which the probationer was "required to report to his probation officer once a month, work [] forty hours a week, and [] participate in a program of mental health treatment," but could still take care of his own basic needs. *Id*. at 187-88 (citing *Taylor v. Garwood*, 98 F. Supp. 2d 672, 677 (E.D. Pa. 2000), *aff'd*, 275 F.3d 38 (3d Cir. 2001)).

Although Bostic's probation clearly imposed restraints on her liberty, Bostic has not pointed to a case in which the special relationship exception was applied to this kind of probation setting, and the Court's research has not revealed one. Rather, the case law in this circuit indicates that the inquiry focuses on whether the state had "custody of a person, thus cutting off alternate avenues of aid," or leaving them *unable* to act on their own behalf. *Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998) (citations omitted); *see Stevens*, 131 F.3d at 702-03 (special relationship "entail[s] a degree of restraint on an individual's personal liberty that make[s it] sufficiently similar to the situations of incarceration and institutionalization"); *A.M.C. by J.C. v. Sch. Dist. of La Crosse*, No. 18-CV-175-BBC, 2018 WL 4689606, at *3-4 (W.D. Wis. Sept. 28, 2018) (finding no special relationship between a minor student and her school: "plaintiffs have not alleged that A.M.C.'s parents relinquished to the school all control or responsibility for providing her basic needs"); *see also Cowgill v. City of Marion*, 127 F. Supp. 2d 1047, 1053 (N.D. Ind. 2000).

In any event, there is a more fundamental reason why Bostic cannot prevail on a failure to protect constitutional claim based on either of the two *DeShaney* exceptions. The Seventh Circuit recently considered in the *Doxtator* case a plaintiff's argument that the state-created danger

18

exception to the no-liability rule in *DeShaney* supported finding § 1983 liability against a commanding officer for another officer's use of excessive force. In response to that argument, the Seventh Circuit said:

> [I]n attempting to take advantage of this "narrow" exception to *DeShaney*, the [plaintiff] misapplies *DeShaney*'s holding to an entirely different scenario and then argues that the same exceptions should apply. *DeShaney* held that the state does not violate the constitution by failing to protect an individual against "*private* violence." [489 U.S. at 197] (emphasis added). This Court has affirmed that this rule applies only to situations in which the harm is perpetrated by private actors. *See, e.g., Wilson v. Warren Cnty., Ill.*, 830 F.3d 464, 469 (7th Cir. 2016) ("Due Process does not require a state to protect citizens from private acts unless the state itself creates the danger."). Limiting *DeShaney*'s rule to instances of private harm makes sense, too, as of course the government violates constitutional rights when it directly perpetrates unjustified violence against an individual. But in such cases, 42 U.S.C. § 1983 allows the victim to seek redress directly for the harm rather than under a significantly more attenuated "state-created danger" theory.

39 F.4th at 866.

Pursuant to *Doxtator*, the exceptions to *DeShaney* do not "allow[ ] plaintiffs to recover for harms perpetrated directly by public officials. … In such instances, the proper vehicle for redress is a § 1983 claim against the entities who perpetrated the harm, seeking redress directly for that harm." *Id.* at 867. In other words, Bostic can recover on her § 1983 claim against Parsons and/or Judge Murray only if she can satisfy the requirements for imposing supervisory liability for Radiceski's unconstitutional conduct on those defendants.

### b.     Supervisory Liability

Pursuant to *Nanda v. Moss*, 412 F.3d 836, 842 (7th Cir. 2005), "supervisory liability can be established if the conduct causing the constitutional deprivation occurs at the supervisor's direction or with the supervisor's knowledge and consent" or if the "supervisor knows about the alleged conduct and facilitates it, approves it, condones it, or turns a blind eye for fear of what he

19

or she might see." The Court questions, however, whether *Nanda* applies here. There is no evidence that Parsons or Judge Murray knew about Radiceski's unconstitutional assault of Bostic, facilitated it, approved it, condoned it, or turned a blind eye to it. In fact, Bostic testified that she did not tell anyone in the probation department about Radiceski's troubling behavior leading up to the rape because they were his co-workers, and she was worried that she would be sent to jail.

Bostic's concerns were certainly understandable,[10] and, if Bostic's allegations are true, Radiceski's abuse of power in putting her in the position of feeling the need to stay silent about his atrocious and illegal conduct was reprehensible. But "[u]nder § 1983, … a supervisory official [must] approve[ ] an unconstitutional action *before* it occurs … [to be] held liable for causing the violation." *Phillips v. Mega Concrete Constr., LLC*, No. 20-CV-658-JDP, 2022 WL 252100, at *8 (W.D. Wis. Jan. 27, 2022) (emphasis added) (citing *Nanda*, 412 F.3d at 842–43). "[A]fter the conduct at issue is completed, there is nothing the official can do to stop it, so she cannot be held liable." *Id.* (citing *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007) ("[Plaintiff's] argument on the merits is that anyone who knows about a violation of the Constitution, and fails to cure it, has violated the Constitution himself. That proposition ... is not correct. Only persons who cause or

---

[10] As the Seventh Circuit explained in a case involving sexual assaults committed by a prison guard against female inmates, the victims "explained their silence in terms familiar to many victims of sexual harassment and assault—shame, doubt anyone would believe them, and fear of retaliation." *J.K.J.*, 960 F.3d at 371. In that case, however, the inmates had a constitutional right to protection under the Eighth Amendment.

participate in the violations are responsible.")).[11] "Failing to discipline a subordinate or take other corrective action isn't enough." *Id.*[12]

Bostic attempts to fit this case within the *Nanda* framework by arguing that Parsons and Judge Murray are subject to supervisory liability because they hired and retained Radiceski knowing that he was of "poor character, temperament and disposition as to be totally unfit" to be a probation officer; and because they failed to adopt and enforce proper procedures for administering the probation department. [*See* DE 81 ¶ 44]. Bostic argues these facts support supervisory liability under the test applied by the Tenth Circuit in *Perry v. Durborow*, 892 F.3d 1116 (10th Cir. 2018). *Perry* involved a § 1983 claim of a pretrial detainee against the county sheriff for supervisory liability for the detainee's rape by a detention officer. *Id.* at 1118. The court stated that to demonstrate the sheriff *personally* violated the detainee's constitutional rights, the detainee had to show "an affirmative link" between the sheriff and the rape, and "to demonstrate such an 'affirmative link,' [the detainee] had to establish (1) personal involvement, (2) causation,

---

[11] *See also McDonald v. Obaisi,* No. 16-CV-5417, 2017 WL 4046351, at *5 (N.D. Ill. Sept. 13, 2017) ("[T]he court can find nothing in the complaint raising the inference that [the defendant] was aware of or involved in the particular misconduct in which his subordinates allegedly engaged."); *compare Escobedo v. City of Fort Wayne*, No. 1:05-CV-424-TS, 2008 WL 1971405, at *35 (N.D. Ind. May 5, 2008) ("This is not a case where the supervisors are merely charged with being negligent in discovering their subordinates' actions. They personally took part in the events[.]"), *aff'd sub nom. Est. of Escobedo v. Martin*, 702 F.3d 388 (7th Cir. 2012), and *aff'd sub nom. Est. of Escobedo v. Bender*, 600 F.3d 770 (7th Cir. 2010), *and aff'd sub nom. Est. of Escobedo v. Martin*, 702 F.3d 388 (7th Cir. 2012).

[12] *See also T.E. v. Sperlik,* 639 F. Supp. 2d 912, 919–20 (N.D. Ill. 2009) ("The Plaintiffs point to … testimony that they informed [the principal] of the details of [the teacher's] abuse and that, armed with that knowledge, she could have prevented other students from being abused by taking steps to remove [the teacher] from his position. … Whether the Defendants had knowledge of [the teacher's] prior violations of the [students'] constitutional rights is not, however, the relevant inquiry. … [A] state actor may be liable if he or she fails to intervene in an imminent or ongoing constitutional violation. The failure-to-intervene doctrine does not, however, impose liability upon state actors for failing to prevent (or predict) constitutional violations that may occur some time in the future." (citation omitted)), *aff'd sub nom. T.E. v. Grindle,* 599 F.3d 583 (7th Cir. 2010).

and (3) state of mind." *Id.* at 1121 (internal citations omitted). The *Perry* court explained that the personal-involvement requirement could be met by showing that the supervisor "was responsible for but failed to create and enforce policies to protect [the plaintiff] from the rape"; that the causation requirement could be met by showing that the supervisor "set in motion a series of events that [he] knew or reasonably should have known would cause others to deprive [the plaintiff] of her constitutional rights"; and that the "requisite state of mind" could be established by showing that the supervisor "acted with deliberate indifference[13]." *Id.* at 1121-22 (quoting *Keith v. Koerner*, 843 F.3d 833, 840, 847-48 (10th Cir. 2016)).

Bostic does not cite any Seventh Circuit case law adopting or applying the Tenth Circuit test. Moreover, although she acknowledges the three parts to the Tenth Circuit's test, she does not develop any argument or evidence that the first two requirements are met here. [*See* DE 223 at 16-17]. Instead, her argument focuses on whether the actions or inactions of Parsons and Judge Murray satisfied the deliberate indifference state of mind requirement. [*Id.* at 17]. Similarly, the Moving Defendants' only argument against finding a constitutional violation focuses on the state of mind inquiry. According to the Moving Defendants, "Plaintiff cannot produce admissible evidence to make a showing sufficient to establish the existence of an element essential to their claim, specifically Defendants' knowledge." [DE 220 at 1]. Without mentioning the deliberate indifference standard by name, the Moving Defendants assert that Bostic's "entire case … hinges on her ability to show that [Defendants] 'turned a blind eye for fear of what they might see.'" Then, apparently assuming without discussion that "turning a blind eye" could be based solely on

---

[13] For the deliberate indifference showing, the court cited the three-part *Farmer* test that required the detainee to show (1) that the sheriff was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]"; (2) that he actually drew that inference; and (3) that he was "aware of and fail[ed] to take reasonable steps to alleviate that risk." *Id.* at 1122 & n.1; *see Farmer v. Brennan*, 511 U.S. 825 (1994).

knowledge of other similar incidents that occurred before Radiceski raped Bostic, the Moving Defendants argue that the 2011 stairwell incident with A.R. was not similar because it did not involve sexual assault, and, in any event, that it occurred two years earlier. They also argue that a single incident is insufficient to put them on notice of an ongoing pattern of behavior. [DE 222 at 5-6].

In the absence of any argument or citation to relevant Seventh Circuit law by either side, the Court will assume for present purposes that: (1) the Seventh Circuit would agree that the personal involvement requirement can be met with evidence that Parsons and/or Judge Murray were "responsible for but failed to create and enforce policies to protect [Bostic] from the rape," and that Bostic is able to present sufficient evidence for a jury to find that requirement satisfied in this case;[14] and (2) the Seventh Circuit would apply the same causation standard as the Tenth Circuit and that Bostic is able to present sufficient evidence to satisfy that causation standard. Even with these assumptions, however, to show a violation of her constitutional rights based on supervisor liability, Bostic still must present evidence to support the state of mind requirement. And her arguments in this regard are premised on the assumption that the applicable standard is

---

[14] Bostic repeatedly relies on the fact that Parsons' and Judge Murray's handling of this situation did not comport with the Probation Standards adopted by the Judicial Conference of the State of Indiana. [DE 232-1]. But even if one assumes that such standards were not followed, that does not show that Judge Murray must have understood any deviation from the standards were unlawful. Those standards indicate that the supervisory judge, in this case Judge Murray, should be ultimately responsible for the oversight of the probation department, and if a complaint is raised against one of the officers, the judge should seek an opinion from the Judicial Qualifications Commission. [*Id*. at 2, 17]. But Bostic does not introduce any evidence that Parsons and Judge Murray were obligated to adopt those standards, and even if they were, violation of those standards is not equivalent to a constitutional violation. *See Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) ("§ 1983 protects plaintiffs from constitutional violations, not violations of state laws or . . . departmental regulations"); *see also Stevens*, 131 F.3d at 707 ("[A]lthough the violation of state laws may provide for a remedy in a state tort action, they do not clearly establish a violation of a constitutional right as required for a § 1983 action.").

the *Farmer* deliberate indifference standard. In fact, however, according to the Seventh Circuit's decisions in a number of cases—including *T.E. v. Grindle*, 599 F.3d 583, 589 (7th Cir. 2010), *Locke v. Haessig*, 788 F.3d 662, 667-68 (7th Cir. 2015), and *Kemp v. Fulton County*, 27 F.4th 491, 498 (7th Cir. 2022)—supervisory liability in this case may require a higher state of mind than deliberate indifference.

A good discussion of the state of mind issue is found in *Locke*. That case involved a male parolee who alleged he was sexually harassed by a parole officer who occasionally filled in for his regular parole officer. *Id.* at 665 ("alleging that the substitute parole officer propositioned the plaintiff for sex, made unwanted physical advances, and offered to release him from electronic monitoring if he would allow the substitute officer to take nude photos of him"). The plaintiff complained to his regular parole officer about the harassment, who then told her supervisor about the plaintiff's complaint, who, in turn, told a regional chief, who directed the supervisor to have the plaintiff's regular parole officer obtain a written statement from the plaintiff. *Id.* Neither the supervisor nor the regular parole officer ever followed up with the plaintiff to obtain a written statement, and the supervisor took no further action to address the complaint of sexual harassment. *Id.* at 666. Quite the opposite in fact—the plaintiff alleged that the supervisor targeted him for harassment because of his complaint. *Id.*

In affirming the district court's denial of summary judgment in favor of the supervisor on qualified immunity grounds, the Seventh Circuit noted that the law of supervisory liability had changed following the Supreme Court's 2009 decision in *Ashcroft v. Iqbal*. In *Iqbal*, "[t]he Supreme Court rejected the view that a supervisor could violate the Equal Protection Clause because of 'mere knowledge of his subordinate's discriminatory purpose.' For constitutional violations under § 1983 . . ., a government official 'is only liable for his or her own misconduct.'

This means that a plaintiff who sues a supervisor must show the state of mind when the underlying constitutional violation requires a state of mind for liability." *Locke*, 788 F.3d at 669 (quoting *Iqbal* and citing: *Barkes v. First Correctional Med., Inc.*, 766 F.3d 307, 319 (3rd Cir. 2014) ("[U]nder *Iqbal*, the level of intent necessary to establish supervisory liability will vary with the underlying constitutional tort alleged."), *rev'd on other grounds sub nom. Taylor v. Barkes*, 575 U.S. 822 (2015), and *Dodds v. Richardson*, 614 F.3d 1185, 1204 (10th Cir. 2010) ("The Court in *Iqbal* explained that the factors necessary to establish a § 1983 violation depend upon the constitutional provision at issue, including the state of mind required to establish a violation of that provision.")[15]).

As the Seventh Circuit further explained in *Locke*, "[b]efore *Iqbal*, most circuits required that a supervisor act (or fail to act) with the state of mind of deliberate indifference to be liable, no matter the underlying constitutional violation. The deliberate indifference test required knowledge of the subordinate's misconduct and deliberate indifference to or tacit authorization of the misconduct." 788 F.3d at 669 (citing, *inter alia*, *Jones*, 856 F.2d at 992 ("The supervisors must

---

[15] While the *Locke* court cited a Tenth Circuit case—*Dodds*—acknowledging the change in law following *Iqbal* regarding the state of mind requirement for supervisory liability, the Tenth Circuit's decision in *Perry* applying the deliberate indifference standard is not inconsistent with either *Dodds* or *Iqbal*. *Perry* involved the rape of a pretrial detainee by a prison guard, and it is well established that the State has an affirmative duty to protect a person in its custody, whether through incarceration or pretrial detention, and that an objective deliberate indifference standard applies to a failure to protect claim in the pretrial detention setting. *See Kingsley v. Hendrickson*, 576 U.S. 389 (2015); *see also Kemp,* 27 F.4th at 498 (noting that the state of mind required to trigger a supervisor's liability varies with the constitutional provision at the heart of the claim, and applying the objective deliberate indifference standard because the facts in that case involved a pretrial detainee who alleged that officers failed to protect him from attacks by other detainees). Cases cited by Bostic such as *Perry* and *Musgrove v. Broglin*, 651 F. Supp. 769 (N.D. Ind. 1986), which involved failure to protect in the pretrial detainee and incarceration settings respectively, are not apposite to this case, because the predicate constitutional tort at issue here is not failure to protect (as discussed in the previous section), but a violation of bodily integrity, and the case law discussed above suggests the latter tort requires an intentional state of mind rather than deliberate indifference.

know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.")). After *Iqbal,* however, the Seventh Circuit "re-examined the state of mind required for supervisory liability for sexual harassment in *T.E. v. Grindle*, 599 F.3d 583 (7th Cir. 2010). In *Grindle*, the plaintiffs sued a school principal for her response to complaints that a band teacher was sexually harassing students at the school. *Locke*, 788 F.3d at 670. *Grindle* "acknowledged that after *Iqbal* a plaintiff must show 'that the supervisor possessed the requisite discriminatory intent.'" *Id.* (quoting *Grindle*, 599 F.3d at 588). But the *Grindle* court concluded "that the plaintiffs' evidence would

> allow a jury to conclude that [the principal] knew about [the teacher's] abuse of the girls and deliberately helped cover it up by misleading the girls' parents, the superintendent, and other administrators. From this evidence, a jury could reasonably infer—though it would not be required to infer—that [the principal] also had a purpose of discriminating against the girls based on their gender. If [the principal] wishes to argue that she merely wanted to avoid a scandal or that she would have taken similar steps to conceal abuse if boys had been the victims, she can present those arguments to the jury, but such suggestions do not mean that she is entitled to judgment as a matter of law.... [A] jury could conclude that by attempting to convert claims about sexual abuse by [the teacher] into complaints about teaching methods, [the principal] treated the girls' complaints differently because of their sex.

*Id*. at 670-71 (quoting *Grindle*, 599 F.3d at 589 (internal citations omitted)). Like in *Grindle*, the court held in *Locke* that the evidence was sufficient for a jury to infer the required mental state of intentional discrimination from the manner in which the supervisor-defendant had handled the plaintiff's complaints of sexual harassment by the substitute parole officer: "Accepting [the plaintiff's] version of the facts, [the supervisor] was more than merely negligent. She failed to intervene or investigate in response to [the plaintiff's] complaint [of sexual harassment] and she then threatened to retaliate against him for complaining of harassment." *Id.* at 668-69.

Unlike in *Locke* and *Grindle*, the Court questions whether Bostic has presented sufficient evidence for a jury to infer that either Parsons or Judge Murray acted with an intentional mental state. Case law suggests such intent is necessary for the constitutional tort of her probation officer sexually assaulting her under color of law and violating her right to bodily integrity, and this is what Bostic seeks to hold Parsons and Judge Murray liable for as Radiceski's supervisors. Evidence that Parsons or Judge Murray "had knowledge of a deficiency is not, without more, enough to maintain an individual liability claim under § 1983." *Taylor v. Ways*, 999 F.3d 478, 495 (7th Cir. 2021); *see also Vance v. Rumsfeld*, 701 F.3d 193, 203 (7th Cir. 2012) ("knowledge of a subordinate's misconduct is not enough for liability."). Rather, Parsons and Judge Murry "can be liable only if [they] want[ed] the unconstitutional or illegal conduct to occur." *Vance*, 701 F.3d at 203 (citing *Iqbal*, 556 U.S. at 677). That is, the evidence would have to allow a reasonable jury to "infer … the specific intent [to violate Bostic's bodily integrity] from evidence that [Parsons and/or Judge Murray] knew about [the rape] and chose not to intervene." *Id.* at 670. Bostic would "not need to prove that [Parsons and/or Judge Murray] w[ere] motivated solely by" the intent to violate Bostic's bodily integrity, "but [s]he must show that [they] chose [their] course of action at least in part *because of*" that motivation. *Id.* at 672-73 (emphasis added); *see also id.* at 669 (stating that the plaintiff "must show more than intent as volition or intent as awareness of consequences"; a supervisor "is liable for undertaking a course of action only because of, not merely in spite of, the action's adverse effects upon an identifiable group" (quoting *Iqbal*, internal quotation marks omitted)). Bostic has not even attempted to make such a showing, relying instead on the "'deliberate indifference' state of mind that *Grindle* disavowed after *Iqbal*." *Id.* at 671 n.3; *see* [DE 232 at 13 ("Judge Murray and Parsons acted with deliberate indifference when they set in motion

a series of events that they knew, or reasonably should have known, would cause Radiceski to deprive Bostic of her constitutional rights.")].

If the Court were to apply the deliberate indifference standard, as the parties have done, the Court finds that it would be a much closer call on whether Bostic can show a constitutional violation.[16] The Court need not analyze the question further, however. As discussed in the next section, the Court concludes that even if a violation occurred using a deliberate indifference standard, Parsons and Judge Murray would be entitled to qualified immunity because the law was not clearly established such that they were on notice that their conduct would violate Bostic's rights.

### 2.      Step Two: Clearly Established Law

The second element of the qualified immunity test requires that the constitutional right at issue be "clearly established." To be clearly established, the right "must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Kemp v. Liebel*, 877 F.3d 346, 350-51 (7th Cir. 2017). Ordinarily, a plaintiff must point to a "closely analogous case" finding the alleged violation unlawful, such that "existing precedent . . . [places] the statutory or constitutional question beyond debate." *Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018); *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013). Alternatively, "[i]n some rare cases, where the constitutional violation is patently obvious," a plaintiff can demonstrate

---

[16] A good discussion of ambiguities in the case law regarding the proper standards for supervisory liability post-*Iqbal* is found in *Tangreti v. Buchmann*, 983 F.3d 609, 616-19 (2d Cir. 2020). There the Second Court acknowledged that *Iqbal* "cast doubt on the continued viability of the special standards for supervisory liability" that were previously established under controlling circuit law, and that "district courts in the circuit have sought, with inconsistent results, to determine the effect of *Iqbal* on supervisory liability." 983 F.3d at 617. For instance, the court noted, some district courts in the Second Circuit "have suggested that *Iqbal* requires a greater showing of intent for § 1983 claims related to invidious discrimination but not necessarily to other constitutional violations." *Id.* at 617 & n. 5 (citing cases).

clearly established law by proving that the defendant's conduct was "so egregious and unreasonable that . . . no reasonable [official] could have thought he was acting lawfully." *Reed*, 906 F.3d at 547 (quoting *Abbott v. Sangamon County*, 705 F.3d 706, 724 (7th Cir. 2013); *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000)).

Since the Court has found that Bostic cannot maintain a claim based on a constitutional right to protection, the constitutional right under consideration is Bostic's right to bodily integrity. Bostic asserts there can be no debate that this right was clearly established in 2013 at the time of Radiceski's assault. [DE 232 at 20 ("[T]he federal courts have held an individual's right to be free from a government actor's sexual assault . . . for over 100 years.")]. The Court does not disagree. *See, e.g., Grindle*, 599 F.3d at 589 (citing *Ingraham v. Wright*, 430 U.S. 651, 672 (1977))[17]. But the issue here is whether it was clearly established in 2013 that the conduct of Parsons and Judge Murray violated Bostic's constitutional rights, not whether Radiceski's conduct violated her rights.

The Seventh Circuit has warned against defining a clearly established right too narrowly. *See, e.g., Abbott*, 705 F.3d at 732 ("[J]ust as defining a right too broadly may defeat the purpose of qualified immunity, defining a right too narrowly may defeat the purpose of § 1983."). And in *Sexton*, the case involving the work-release program, the Sixth Circuit defined the relevant right in similarly broad terms: "[A]ny reasonable supervisor would be aware that a probationer is entitled to be free from sexual assault and that facilitating the assault or failing to stop such an assault would contribute to a violation of clearly established rights." 18 F.4th at 193. This is consistent with case law indicating that a "patently obvious" violation does not need a factually similar case. *Reed*, 906 F.3d at 547. But while no one disputes that the *right* to be free from sexual

---

[17] The Moving Defendants did not contest that "there is a clearly established right to bodily integrity such that individuals have a right to be free from sexual abuse." [DE 237 at 3].

assault is well-established, in the absence of a closely analogous case, the defendant's *conduct* must demonstrate a patently obvious violation. *Id*.; *see also Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (a right is clearly established only if "every reasonable official would have understood that what he is doing violates that right"); *Campbell v. Kallas*, 936 F.3d 536, 546 (7th Cir. 2019) ("Frame the constitutional right in terms granular enough to provide fair notice, because qualified immunity 'protects all but the plainly incompetent or those who knowingly violate the law.'") (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)).[18]

In assessing whether supervisory liability under the facts of this case was clearly established, the Court begins by noting that by 2013, it was established already that, pursuant to *Iqbal*, supervisory liability requires the same mental state as the predicate tort. While both *Locke* and *Grindle* rejected qualified immunity arguments applying the *Iqbal* rule that a predicate tort requiring intentional conduct meant that supervisory liability must also be predicted on intentional conduct, the facts in this case are not comparable to those cases. In both cases, the supervisors could have intervened to put a stop to on-going harassment suffered by the plaintiffs at the hands of the probation officer/teacher in question. As previously noted, the Seventh Circuit found the evidence sufficient to present a jury question in *Locke* because the supervisor was informed of the sexual harassment by the substitute parole officer yet did nothing about it. Here, Bostic did not

---

[18] The Court notes that several district court cases within this circuit have seemed to suggest a different standard, although likely simply refer to the difference between what the court finds as undisputed material facts versus the relevant clearly established law. *See, e.g., B.A. v. Bohlmann*, No. 09-CV-346-WMC, 2011 WL 13359266, at *2 (W.D. Wis. Jan. 25, 2011) ("What needs to be 'clearly established' is this constitutional right, not that defendants' actions constitute deliberate indifference."). The Court believes that the case law cited herein establishes that a plaintiff must not simply show that an established right was taken away, but also that any reasonable official would know that the particular actions they took, or did not take, would constitute a deprivation of that right. Put another way, "[t]he question is whether *the wrongfulness of the defendant's conduct* was clearly established." *Taylor v. Ways*, 999 F.3d 478, 491 (7th Cir. 2021) (citing *Armstrong v. Daily*, 786 F.3d 529, 556 (7th Cir. 2015)).

suffer an on-going deprivation of her right to bodily integrity that Parsons and Judge Murray knew about but failed to stop. And there were no indications that similar prior allegations brought by a different group, such as male probationers, were handled any differently. There is thus no evidence of "selective inaction." *Id*. at 671. Moreover, the *Locke* court found that the plaintiff had "provided evidence that tend[ed] to show that [the supervisor's] response was more than mere inaction. A reasonable jury could infer that "[the supervisor] had the requisite intent to discriminate because she threatened to retaliate against [the plaintiff] after he complained of sexual harassment." *Id*. Again, here, there is no evidence of retaliation. The facts in *Grindle* are similar (if not worse). There, the evidence showed that the supervisor not only knew about the on-going harassment, she "deliberately helped cover it up by misleading the girls' parent, the superintendent, and other administrators." 599 F.3d at 589.

Furthermore, even if Bostic is correct and the applicable state of mind is deliberate indifference, she has not shown that the law was well established that Parsons' and Judge Murray's actions or inactions violated her constitutional right to bodily integrity. Presented in the light most favorable to Bostic, Judge Murray's knowledge of Radiceski is as follows: He was made aware of A.R.'s 2011 complaint when Parsons gave him a report of A.R.'s allegations and Radiceski's denial. He and Parsons agreed that Radiceski should not be given female probationers to supervise. Although Judge Murray was aware that A.R.'s complaint could be a criminal matter, Parsons and Stone testified that Judge Murray declined to refer the matter to the police on the ground that A.R. had not requested that any further action be taken. Judge Murray, on the other hand, testified that he instructed Parsons to refer the matter to the police.[19] He also did not make any policy changes

---

[19] It could be argued that Judge Murray's version of events is more favorable to Bostic than Parsons and Stone's version, because a referral to the police would suggest that Judge Murray himself inferred that the report was serious and sufficiently credible. On the other hand, Parsons and

to the probation department based on the incident with A.R., because he believed it was Parsons' job to implement any such changes. Parsons is in a somewhat different situation from Judge Murray. Taking the evidence in the light most favorable to Bostic, Parsons had the same knowledge and involvement as Judge Murray, and, in addition, she: (1) made, or was at least aware of, the decision to allow Radiceski to supervise female probationers again; (2) was aware of Radiceski's persistent request to see a particular female probationer; and (3) denied those requests explicitly because she was alarmed by Radiceski's insistence on having that probationer. A jury could also infer that Parsons ignored a request to report Radiceski's allegation to the police.

As the Moving Defendants point out, at the time of Bostic's rape, both Judge Murray and Parsons were aware of the 2011 complaint by A.R. While Radiceski's alleged conduct in that instance did not culminate in an actual assault, A.R.'s complaint alleged an abuse of power leading up to what could have been a sexual assault. In many ways this mirrored what later happened to Bostic (a reasonable jury could infer that, other than the fact that A.R. was somehow able to narrowly escape the final act of sexual assault whereas Bostic was not, the stairwell incidents were similar).[20] Perhaps Radiceski heard someone else coming to the stairwell prior to the A.R. incident,

---

Stone's version is also helpful to Bostic in that, *despite* Judge Murray's understanding that Radiceski may have been engaged in criminal conduct, he declined to instruct that the police become involved. Either way, the outcome of this motion is the same.

[20] It should be noted that, although A.R. did not allege sexual contact, she did allege that Radiceski pulled at her pants, at which point A.R. asked to leave. A reasonable juror might infer that no sexual contact occurred only because she was able to extricate herself from the situation. It may be true that, as Defendants say, no one "knew Radicescki would undertake the course of conduct toward Plaintiff that he is accused of." [DE 222 at 6]. But Bostic does not need to show that Defendants knew exactly what Radiceski would do. *See J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 793 (7th Cir. 2003) (holding that plaintiffs were required to show a "connection" between the perceived risk and the ultimate injury); *c.f. Medas v. Maresh*, No. 1:14 CV 1253, 2015 WL 10986349, at *6 (N.D. Ohio Sept. 24, 2015) (finding that allegations of sexual assault against a probation officer did not establish a "strong enough connection" to put a supervisor on notice that the officer would sexually assault a probationer).

or any number of small differences changed the outcome that day. Still, Bostic has not provided a case in which a supervisor was found liable for a co-worker's sexual assault based on the fact that the co-worker had previously engaged in an inappropriate, sexually suggestive battery with a different person. There is case law suggesting that such liability could exist. *See, e.g., Vetter v. Dozier*, No. 06-CV-3528, 2010 WL 1333315, at *14 (N.D. Ill. Mar. 31, 2010) ("Supervisors may be liable under Section 1983 for a tort committed by a subordinate where the supervisors were aware of earlier complaints that pertained to individuals other than the plaintiff."). But the *Vetter* court ultimately found: "The only case law of which the Court is aware indicates that a single incident ordinarily will not be sufficient to establish causation. Two is the minimum number of incidents that have proved sufficient." *Id.* at *19; *see also Williams v. Blagojevich*, No. 06-CV-772-MJR, 2010 WL 456760, at *5-6 (S.D. Ill. Feb. 4, 2010) (prisoner's grievances about a single prior incident of abuse did not put prison officials on notice of "impending harm"). Importantly, A.R.'s 2011 complaint is the only prior instance of which Parsons and Judge Murray were aware.[21]

Ultimately, the qualified immunity issue turns on the fact that Bostic brings forth no cases that would suggest that a reasonable person serving in Judge Murray's or Parsons's role would have understood their actions were unlawful. Bostic argues that liability is shown by Judge Murray's and Parsons's failure to create and enforce policies to prevent misconduct. The Court acknowledges two cases cited by Bostic indicating that a supervisor's personal involvement can be shown by their failure to create and enforce policies to prevent misconduct. However, neither case is from this circuit. Moreover, both are factually distinguishable. In *Keith*, 843 F.3d 833, a

---

[21] Bostic points to the prior chief probation officer who faced criminal charges after he kissed a female probationer in her home. That officer was ultimately removed from the chief position, but not terminated. Parsons and Judge Murray were both aware of this incident, but Bostic does not explain how this incident constituted notice of Radiceski's proclivity to sexual assault.

prison had far more complaints of sexual assault than comparable facilities. The court examined how those cases were handled and found evidence that the warden "had created an atmosphere where employees . . . faced minimal supervision and little threat of investigation or discipline for inappropriate sexual behavior with inmates." *Id*. at 843-846. The other case, *Perry*, actually supports the state defendants' position. The district court denied summary judgment to a sheriff, finding that he may have caused an increased risk of sexual assault to female detainees because he knew that male officers were entering the women's pod of the jail when they were not supposed to, and that there were "blind spots" in the jail surveillance system. 892 F.3d at 1123. But the Tenth Circuit reversed, finding this evidence insufficient to hold the sheriff liable under § 1983, largely because he was not aware of any sexual assaults that had resulted from these practices; in other words, the serious harm had not "already previously materialized." *See id*. at 1125-26.

The Court's review of case law in this circuit suggests that, in the cases contemplating liability for a subordinate's sexual assault, the supervisor either encouraged the assault, indirectly participated in the assault, ignored a series of complaints, or dissuaded the assailant from complaining. That was also true in *Sexton*, the Sixth Circuit case where the court defined the clearly established right broadly in affirming denial of summary judgment to a probation supervisor.[22] None of those elements are present here. And courts from outside this circuit have declined to find supervisory liability for sexual assault in the probation context, despite warnings that were much

---

[22] *See* 18 F.4th at 185-86 (holding that one supervisor could be held jointly liable for participation in another supervisor's sexual assault because: (1) he "ordered [the plaintiff] to ride alone in the pickup truck with [the assaulting supervisor], in violation of the Township's policy against female probationers riding alone with supervisors," (2) he "refused each of [the plaintiff's] requests to ride in the van with the other probationers"; and (3) there was "circumstantial evidence that [he] was aware of [the assaulting supervisor's] plans, including the whispered conversations and laughter between the men before [he] issued his orders to [the plaintiff] to go with [the assaulting supervisor]" and his "statement to [the assaulting supervisor] to 'have a good time' with [the plaintiff]").

more severe than those confronted by the defendants in this case. *See Miller v. Thompson*, No. 4:20-CV-2 (CDL), 2022 WL 3648562, at *4 (M.D. Ga. Aug. 24, 2022) (no supervisory liability for a commissioner of probation despite 19 investigations of sexually inappropriate conduct by officers in that department in a three-year period; the plaintiff "did not point to any authority clearly establishing that a supervisor could be liable under § 1983 by failing to investigate or monitor an employee based on a report of unspecified inappropriate behavior"); *McPeters v. Parker*, No. 3:18-CV-39, 2019 WL 1409848, at *8 (E.D. Tenn. Mar. 28, 2019) (rejecting failure to train theory of supervisory liability for probation officer's rape, stating that "[t]heories of individual supervisory liability" require "active participation" in the minimal sense "that the supervising defendant at least implicitly authorized, or knowingly acquiesced in the unconstitutional conduct," and "are, in this way, stricter than theories of municipal liability [under *Monell*] for failure to train or supervise employees, which may be premised on a failure to act"); *Medas v. Maresh*, No. 1:14 CV 1253, 2015 WL 10986349 (N.D. Ohio Sept. 24, 2015) (the fact that a probation officer was a subject in two sexual assault investigations when he was a minor did not provide a "strong enough connection" to sustain a § 1983 claim based on negligent hiring, after he was convicted of sexually assaulting a probationer); *see also Doe v. Magoffi Cnty. Fiscal Court*, 174 F. App'x 962 (6th Cir. 2006) (holding that neither the county nor supervisor were liable under § 1983 for janitor's rape of minor performing community service at courthouse because janitor's criminal record of voter fraud, attempted arson, and battery against a male politician while drunk did not make it plainly obvious that he would commit sexual assault or falsely imprison someone, and because the plaintiff's failure to supervise claim based on an inaction theory also failed without evidence of a pattern of sexual abuse, i.e., the only sexual abuse in evidence was the plaintiff's rape).

35

In sum, Bostic has not cited any cases to demonstrate that the law was clearly established that Parsons or Judge Murray would have understood that their conduct would violate Bostic's constitutional right to bodily integrity. Nor has she presented case law clearly establishing that their conduct was "so egregious and unreasonable that . . . no reasonable [official] could have thought [he or she] was acting lawfully." *Reed*, 906 F.3d at 547. Accordingly, Parsons and Judge Murray are entitled to qualified immunity on Bostic's § 1983 claim.

### D.   CONCLUSION

For the reasons described herein, the Court **GRANTS** Defendants' motion for summary judgment [DE 220]. Count 1 is **DISMISSED** as to Defendants Salvadore Vasquez, Clarence D. Murray, Diane Ross Boswell, Thomas P. Stefaniak, Jr., and Jan Parsons. Count 1 remains pending against Defendant Miroslav Radiceski.

So ORDERED this 23rd day of January, 2023.

s/ Joshua P. Kolar
MAGISTRATE JUDGE JOSHUA P. KOLAR
UNITED STATES DISTRICT COURT